IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

| | |
|---|---|
| OLGA ZINGERMAN, f/k/a Olga Pagoda : | |
| 23411 Winemiller Way : | |
| Clarksburg, MD 20871 | |
| : | |
| Plaintiff, | |
| : | |
| v. : | Civil Action No. |
| : | |
| DESIGN DATA SYSTEMS, INC. | |
| 610 Professional Dr., # 102 : | |
| Gaithersburg, MD 20879 | |
| : | |
| SERVE ON: | |
| Dennis H. Ruck Jr., Resident Agent : | |
| 610 Professional Dr., # 102 | |
| Gaithersburg, MD 20879 : | |
| | |
| and : | |
| | |
| DOYON GOVERNMENT CONTRACTING,: | |
| INC., d/b/a | |
| DOYON GOVERNMENT GROUP : | |
| 33810 Weyerhaeuser Way S., Ste. 100 | |
| Federal Way, WA 98001 : | |
| | |
| SERVE ON: | |
| The Corporation Trust Incorporated : | |
| 2405 York Rd., Ste. 201 | |
| Lutherville Timonium, MD 21093-2264 : | |
| | |
| Defendants. : | |

## COMPLAINT

Plaintiff, Olga Zingerman, f/k/a Olga Pagoda by and through undersigned counsel hereby

files her Complaint against Defendants, Design Data Systems, Inc. and Doyon Government

Contracting, Inc. d/b/a Doyon Government Group (together referred to as "Design Data") and alleges as follows:

## NATURE OF THE ACTION

1.     Plaintiff, Olga Zingerman, f/k/a Pagoda ("Ms. Pagoda or Plaintiff"), by and through her undersigned counsel, brings this action against Defendants pursuant to the Americans with Disabilities Act of 1991 and the Americans with Disabilities Amendments Act of 2008 (together, "ADA"), 42 U.S.C. §12101 *et seq.*, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.* ("Title VII"), and the Maryland Fair Employment Practices Act, Maryland Code Ann., State Gov't. §20-601, *et seq.* for injuries and damages she sustained as a result of Defendants' discrimination and retaliation.

## PARTIES

2.     Plaintiff, Olga Pagoda (this Complaint will use "Pagoda" as that was the name Plaintiff was known by during her employment with Defendants) is a natural person who maintains her residence in Clarksburg, Maryland.  At all times relevant to the allegations of the complaint, Ms. Pagoda was an employee of Defendant, Design Data Systems, Inc. in Maryland and had maintained her residence in Maryland.

3.     Defendant, Design Data Systems, Inc. is, and was at all times relevant to the Complaint, a Maryland corporation with offices in Gaithersburg, Maryland.  Defendant, Design Data Systems, Inc. is engaged in the business of providing outsourced IT, IT consulting and data centers. In or about 2015, Design Data was bought by Defendant, Doyon Government Contracting, Inc., d/b/a Doyon Government Group, based in the state of Washington but registered as a foreign corporation in the state of Maryland. Design Data continues doing business under its name.  Upon

information and belief, Doyon Government Group employs in excess of 500 people.  At all times

relevant to the complaint, Defendants employed more than 15 employees.

**JURISDICTION AND VENUE**

4.      Under the authority of 28 U.S.C. §1331, this Court has jurisdiction over the subject

matter of Ms. Pagoda's claims under the ADA, 42 U.S.C. §12101 *et seq.*, and under Title VII, 42

U.S.C. §2000e *et seq.* because the claims arise under the laws of the United States.

5.      Under the authority of 28 U.S.C. §1367, this Court also has supplemental

jurisdiction over Ms. Pagoda's other claims in this action because they arise from the same core

of operative facts from which the ADA and Title VII claims arise.

6.      Venue is properly laid in this judicial district because, pursuant to 28 U.S.C. §1391,

all of the acts and omissions giving rise to the claims asserted herein occurred in the District of

Maryland.

7.      All applicable administrative and procedural requirements have been satisfied. The

requisite Notice of Right to Sue was issued by the United States Equal Employment Opportunity

Commission to Ms. Pagoda on October 28, 2019 which she received on October 29, 2019. Ms.

Pagoda has filed this Complaint within ninety (90) days of her receipt of the Notice of Right to

Sue.

**FACTS COMMON TO ALL COUNTS**

8.      Ms. Pagoda began her employment with Design Data on or about December 2,

2013 as a Technical Account Manager ("TAM") to oversee client networks for a number of non-

profit companies. Ms. Pagoda was the main point of contact with the clients' upper management

representatives and responsible for their overall IT environment.  She served as the liaison between

the lay people and technical people. She supported their technical needs.  As an exempt employee, Ms. Pagoda worked any and all hours needed to accomplish her job

9.      Ms. Pagoda reported to work at Design Data's office in Gaithersburg on most days; however, she and other TAMS also worked remotely on occasion.  Her work was such that it could be performed from any location with the proper computer connections. Her clients could be located anywhere. One large client was had offices located in London, England and in Singapore.

10.      By all accounts, Ms. Pagoda was doing excellent work. She received good performance reviews, regularly receiving raises or bonuses, including a $1,500 bonus in February 2017 when Design Data told her it was happy with her work. Ms. Pagoda regularly received thank you notes and "attaboys" from both internal and external contacts complimenting her for a job well done.  In short, Ms. Pagoda was performing her job to, and above, Design Data's legitimate expectations.

11.      Ms. Pagoda's supervisory chain was as follows: initially, she reported to her direct manager, T.J. Rainsford.  When Mr. Rainsford left the company, she reported directly to Jonathan Roy, Director of Technical Services.  Mr. Roy reported to Russ Coxe,,CTO who reported to the President and founder of Design Data, Dennis Ruck.

12.      On February 24, 2017, Ms. Pagoda was seriously injured in a car accident when the car she was driving was hit by a large truck.  As a result of the accident, she started experiencing numbness in her arms and legs. She was diagnosed with two protruded discs in her neck causing the numbness for which she received physical therapy and other medical treatment  for the past two plus years. She also experienced pain and soreness in her neck and back, which at some times, was debilitating.

4

13.     Ms. Pagoda's condition was such that on some days, sitting at a desk for prolonged periods of time exacerbated her symptoms of pain. Her medical providers directed her to lie in a supine position intermittently throughout the day when her symptoms flare up. Additionally, she was to use a heat pack under her neck and upper back for 15 to 20 minutes, sometimes multiple times during the day, in order to obtain relief and be able to continue working.

14.     After her accident, Ms. Pagoda requested and was permitted to work remotely one day due to her neck/back issues. When she asked about working remotely to enable her to relieve the pain, her manager, Jonathan Roy made it clear that she should use sick leave instead. Ms. Pagoda attempted to discuss the remote policy but met stiff resistance to her requests. Neither Mr. Roy nor Mr. Ruck wanted to discuss her requests.

15.     Ms. Pagoda's job did not require her to be on customer sites or even in an office. Her job was just as easily performed from her house as from the Gaithersburg office.  To her clients, she was always remote.  Frequently, she worked outside of normal business hours to accomplish the task at hand. Some of her clients were located in different time zones, including London and Singapore. It was unimportant to them how many hours she sat at a desk in Gaithersburg or whether she took needed breaks during the day. What was important was that she solved their problems in a timely fashion, and she did. In March 2017, just one month after her accident, she worked from home at evenings for two weeks to restore the London client's system when they lost 1 terabyte of data. No one complained about her working from home then, but when she needed accommodation for disabilities caused by her injuries, she was denied permission to work from home and told she should take sick leave.  Mr. Roy told Ms. Pagoda that she could not be as productive working at home because she has a child there. He sent an email stating she can't

5

work from home because she is the primary caregiver of her son. Her son was enrolled in regular day care outside of the home. Ms. Pagoda had no intention of keeping her son home when she was experiencing physical difficulties. Mr. Roy did not inquire whether her son would be at home on days when she needed to work remotely to alleviate her pain. (There were days that Ms. Pagoda asked whether she should work remotely or take a day off because of daycare closures. On such days, Ms. Pagoda certainly disclosed that her son would be home with her.)

16.     Ms. Pagoda's request to work remotely was a reasonable accommodation. Ms. Pagoda had worked remotely in the past effectively and without issue.

17.     Additionally, the same time Ms. Pagoda was denied permission to work from home as a reasonable accommodation, Design Data was permitting two male colleagues to work from home for the sake of convenience. Ryan Murphy, a TAM like Ms. Pagoda, had five minor children at home, four of whom were under the age of 10. He wanted to be able to help his wife with childcare. Mr. Murphy was permitted to work remotely from home one day a week, every week, meaning he worked from home approximately 50 days a year.

18.     Kevin Welch is a Systems Administrator (escalation engineer) whose job requires much more office presence than a TAM because he is the first escalation point for the service desk engineers, who all were in the office and needed to work onsite, so he needed to be there for the continuous escalation requests. Mr. Welch had two minor children and a wife who was dealing with some health issues. He too wanted to be able to help his family. Mr. Welch was permitted to work remotely from home one day a week, every week, meaning he worked from home approximately 50 days a year.

19.     Another employee, a female who was a client technology manager, another position that rarely involved work on customer sites, asked Design Data to work remotely one day a week after her son was born. Design Data refused to approve it. The employee left the company as a result.

20.     Ms. Pagoda was a high performer who always completed her work and attended to work needs late at night to provide excellent customer service. Mr. Roy did not extend the same remote work conditions to Ms. Pagoda when she occasionally needed them as a reasonable medical accommodation despite the fact that he regularly permitted her male colleagues to work remotely.

21.     Ms. Pagoda's request to work remotely to help with her disability would not have caused undue hardship to Defendants. She, and her male colleagues, had proven that remote work was effective. Moreover, her request was not excessive. Had she been permitted to work remotely as a reasonable accommodation, she would have worked remotely six additional days, from February to November 2017, instead of taking sick leave due to her disability. These were days she was capable of working from home but was not well enough to come into the office for a full day.

22.     Between February and November, 2017, Ms. Pagoda began experiencing other adverse actions concerning the terms, conditions, and privileges of her employment. She was intentionally left out of meetings and her clients were told that she couldn't join the meetings, mangers instructed engineers to go to another TAM with technical questions about customers she managed, and managers did not inform her of projects being executed at client sites she managed.

23.     On October 2, 2017, while at work, Ms. Pagoda was rushed to the emergency room when she had an ovarian cyst burst. On October 2, 2017, from the hospital, Ms. Pagoda emailed

Mr. Roy updating him on her condition and asking if she could work remotely the next few days, beginning Oct. 4 while lying in bed at home. Mr. Roy did not respond that day but sent her three emails the next day, October 3, initially saying he could approve one day of remote work, then saying she needs to bring a doctor's note to the office on her first day back to the office, and finally, at the end of the day saying she needs to provide the note before she can work, even remotely. Without access to a hospital doctor, she had to wait until Friday, October 6 to see her doctor, which resulted in Design Data charging her with 18 hours of vacation time/sick leave when she was capable of working remotely. HR later informed her that she could have used her hospital discharge papers as a doctor's note. Despite her timely inquiries, no one provided her with accurate information that would have permitted her to work. She repeatedly respectfully asked if there was a way she could get the 18 hours back (for example, allowing her to work comp time), but she never received a response

24.    Ms. Pagoda's requests to her manager for remote work accommodation when her neck and back problems acted up were sufficient to trigger Defendants' obligations under the ADA.  The Act does not require an employee to use any magic words. After Ms. Pagoda's requests were denied, and it became clear that her manager and the company's president had no interest in accommodating her disability, Ms. Pagoda made a formal, written request for accommodation on October 20, 2017. She supported her request with a letter from her physical therapist, and she offered to provide further information from her neurologist.

25.    On November 7, 2017, Chrystal Myers of Human Resources told Ms. Pagoda that Defendants could not offer her requested accommodation of working remotely when needed to address pain.  Instead, she said they would offer 12 weeks FMLA leave, unpaid, along with an

ergonomic work station assessment. Ms. Pagoda asked why Defendants chose not to offer her the ability to work remotely. Ms. Myers' answer was that it makes her a liability to the company. Ms. Pagoda asked if she could have some time to think about it, and Ms. Myers said yes.

26.     Ms. Pagoda had already been scheduled to meet with Design Data's president, Dennis Ruck and Human Resources representative, Kristiana Terney the next day on November 8, 2017 to discuss her request to work remotely. Instead of discussing her request, Mr. Ruck outright rejected the "interactive process" when he began the meeting with the statement: "I know that we were supposed to discuss your request for reasonable accommodation, but I see that you're unhappy here, so we really need to discuss your employment. Here is my severance offer . . ."

27.     Mr. Ruck offered to employ Ms. Pagoda for four weeks, during which she would transition her clients to other employees, and then pay her four weeks of severance. He gave her one day to decide whether to accept. She asked for more time; he said "you're terminated as of right now."

28.     Contrary to Mr. Ruck's statement, Ms. Pagoda thoroughly enjoyed her work and frequently told clients so. The only aspect causing her unhappiness was Defendants' unwillingness to address her disability accommodation request. When Defendants finally addressed her formal request, they just as quickly aborted the process the next day by terminating her employment.

29.     Depending upon how the ergonomic workstation assessment went and depending upon whether Design Data purchased an ergonomic workstation and whether it afforded relief, Ms. Pagoda may or may not have challenged Design Data's denial of her requested remote work accommodation as being unreasonable. Alternatively, if an ergonomic workstation proved ineffective, Design Data might then have approved remote work. We cannot know what would

have happened because Design Data that did not allow the process to run its course. It discriminated against Ms. Pagoda for her disability and retaliated against Ms. Pagoda for making the accommodation request.

30.     Ms. Pagoda has incurred lost wages, loss of reputation and loss of career opportunity now and in the future, and has suffered emotional pain, suffering, inconvenience, loss of enjoyment of life and other non-pecuniary losses.  She has further experienced severe emotional and physical distress.

### COUNT I
### (Disparate Treatment based on Disability in Violation of the ADA, 42 U.S.C. §12111, *et. seq.*)

31.     Ms. Pagoda incorporates the allegations in the preceding paragraphs as if they were fully stated herein.

32.     From late February, 2017 through the termination of her employment in November, 2017, Ms. Pagoda had a disability within the meaning of the ADA, 42 U.S.C. §12102.

33.     Notwithstanding her disability, Ms. Pagoda was a "qualified individual" within the meaning of the ADA, 42 U.S.C. §12111(8).

34.     Ms. Pagoda requested the ability to work remotely on occasions when her disability prevented her from sitting at a desk for extended periods of time. Her doctors had instructed her to lie prone and apply heat packs as needed for brief intervals between work sessions to give her neck and back much needed relief.

35.     The accommodations Ms. Pagoda requested were reasonable. Defendants permitted two male employees in roles identical and similar to hers, respectively, to work remotely one day a week, every week. Ms. Pagoda did not take advantage of Defendants. Her requests for

accommodation were infrequent, especially after Mr. Roy's instruction to her that she needs to use sick leave instead of working remotely.

36.     Defendants disliked being asked to accommodate Ms. Pagoda. They were irritated by her various attempts to address the issue.  President, Dennis Ruck was most irritated by Ms. Pagoda's formal request for reasonable accommodation which HR discussed with her on November 7, 2017.

37.     On November 8, 2017, Mr. Ruck, acting on behalf of Defendants, terminated Ms. Pagoda from her employment on the basis of her disability.

38.     By terminating Ms. Pagoda, Defendants discriminated against her on the basis of her disabilities, her record of such, or regarded her as being more disabled than she actually was. By so discriminating against Ms. Pagoda on the basis of her disabilities, Defendants violated the ADA, 42 U.S.C. §12112.

39.     Before terminating Ms. Pagoda, Defendants discriminated against her on the basis of her disabilities through various adverse employment actions against Ms. Pagoda that affected her advancement, and other terms, conditions and privileges of employment.  These actions, ranging from excluding her from meetings to withholding information she needed to serve her clients and others, were such that a reasonable employee would have found the challenged action materially adverse, meaning Defendants' actions would have dissuaded a reasonable worker from making or supporting a charge of discrimination.  By so discriminating against Ms. Pagoda on the basis of her disabilities, Defendants violated the ADA, 42 U.S.C. §12112.

40.     Defendants' acts and omissions were willful and malicious, and they were taken with reckless disregard for Ms. Pagoda's rights.  As a result of Defendants' violations of the ADA,

Ms. Pagoda has suffered and is suffering injuries, including loss of past, present, and future earnings and considerable mental distress.

WHEREFORE, Ms. Pagoda demands judgment against Defendants comprising:   (a) appropriate back pay with prejudgment interest, in amounts to be determined at trial; (b) other affirmative relief necessary to eradicate the effects of Defendants' unlawful employment practices, including but not limited to front pay and reinstatement; (c) compensation for past and future pecuniary losses resulting from the unlawful employment practices, in amounts to be determined at trial; (d) compensation for past and future non-pecuniary losses resulting from the unlawful practices complained of above, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, in the amount of $300,000; (f) punitive damages for Defendants' malicious and reckless conduct described above, in the amount of $300,000; (g) attorney's fees, costs and expenses; and (h) such other, further, and general relief as to the Court seems just and proper.

## COUNT II
### (Violation of the ADA – Illegal Failure to Make Reasonable Accommodation, 42 U.S.C. §12111, *et. seq.*)

41.     Ms. Pagoda incorporates the allegations in the preceding paragraphs as if they were fully stated herein.

42.     From late February, 2017 through the termination of her employment in November, 2017, Ms. Pagoda had a disability within the meaning of the ADA, 42 U.S.C. §12102. Defendants knew about Ms. Pagoda's automobile accident and about her resulting disability.

43.     Notwithstanding her disability, Ms. Pagoda was a "qualified individual" within the meaning of the ADA, 42 U.S.C. §12111(8).  She could perform the essential functions of her job with a reasonable accommodation.

44.     After her automobile accident in February, 2017, Ms. Pagoda requested the ability to work remotely on occasions when her disability prevented her from sitting at a desk for extended periods of time. Her doctors had instructed her to lie prone and apply heat packs as needed for brief intervals between work sessions to give her neck and back much needed relief.

45.     Ms. Pagoda's supervisor, Jonathan Roy, was reluctant to grant such requests. He strongly encouraged her to use sick leave when her neck needed a rest. He had communicated that Defendants have a policy of not permitting remote work when someone is the primary caregiver of a child, notwithstanding whether Ms. Pagoda's disability prompted her request and her son would be in daycare and not home with her.  Ms. Pagoda attempted to meet with President, Dennis Ruck to address the remote work policy, to no avail.

46.     Finally, in October, 2017, Ms. Pagoda made a formal, written request for a reasonable accommodation of remote work on the occasions when her disability prevented her from sitting at a desk for extended periods without the ability to obtain relief. Human resources contacted her about her request on November 7, 2017 and advised that it was denied.

47.     Defendants offered to conduct an ergonomic workstation assessment which Ms. Pagoda was willing to consider.  However, the very next day, Defendants terminated Ms. Pagoda's employment.

48.     Ms. Pagoda's request for occasional use of remote work was a reasonable request. Her work was performed on the computer and could be done from anywhere. Two of her male

colleagues worked from home once a week, every week. Had she been allowed to work remotely for her disability, instead of using sick leave, Ms. Pagoda would have worked only 6 more days in 2017 remotely.  Her requested accommodation would not have imposed an undue hardship on Defendants.

49.    By failing to accommodate Ms. Pagoda's disability, Defendants discriminated against her on the basis of her disabilities in violation of the ADA, 42 U.S.C. §12112(b)(5)(A).

WHEREFORE, Ms. Pagoda demands judgment against Defendants comprising:  (a) appropriate back pay with prejudgment interest, in amounts to be determined at trial; (b) other affirmative relief necessary to eradicate the effects of Defendants' unlawful employment practices, including but not limited to front pay and reinstatement; (c) compensation for past and future pecuniary losses resulting from the unlawful employment practices, in amounts to be determined at trial; (d) compensation for past and future non-pecuniary losses resulting from the unlawful practices complained of above, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, in the amount of $300,000; (f) punitive damages for Defendants' malicious and reckless conduct described above, in the amount of $300,000; (g) attorney's fees, costs and expenses; and (h) such other, further, and general relief as to the Court seems just and proper.

## COUNT III
### (Unlawful Retaliation in Violation of the ADA, 42 U.S.C. §12203)

50.    Ms. Pagoda incorporates the allegations in the preceding paragraphs as if they were fully stated herein.

51.    Ms. Pagoda engaged in a protected activity: a) by requesting accommodation for her disability in the form of requests to work remotely, and b) by opposing Defendants' denials of remote work.

52.    Ms. Pagoda's requests for accommodation for her disability include her requests to her supervisor to work remotely:  i) after her accident in the Spring of 2017 when her neck/back pain was acting up, ii) her request to work remotely after her hospitalization in October 2017, and iii) as part of her formal, written reasonable accommodation request that she made in October 2017 and that she first discussed with HR on November 7, 2017.

53.    Ms. Pagoda's opposition to Defendants' denials of remote work include her formal, written request to HR in October 2017 and her attempt to engage in the interactive process in November 2017 to understand why remote work was denied and to explore other reasonable accommodations.  Her opposition also includes her various attempts following her February 2017 accident, to discuss with her immediate supervisor, Jonathan Roy and to then President, Dennis Ruck, the remote work policy as applied to her, her desire to encourage revision of the remote work policy, and her requests to reinstate sick leave time that she was forced to take instead of being allowed to work remotely following hospitalization.

54.    Acting at all relevant times as Defendants' agent, Mr. Ruck took adverse employment action against Ms. Pagoda by declaring Ms. Pagoda unhappy and terminating her employment on November 8, 2017.  He terminated Ms. Pagoda's employment, and in so doing, the continuation of the ADA's "interactive process," just one day after HR told Ms. Pagoda that Defendants were not approving her reasonable accommodation request to work remotely on occasions when her disability acted up.

55.     A reasonable employee would find that being terminated is a materially adverse action which would dissuade an employee from requesting a reasonable accommodation for disability or otherwise making or supporting a charge or complaint of discrimination.

56.     Between the time of Ms. Pagoda's accident in February, 2017 and her termination in November, 2017, Defendants took various adverse employment actions against Ms. Pagoda that affected her advancement, and other terms, conditions and privileges of employment.   These actions, ranging from excluding her from meetings to withholding information she needed to serve her clients and others, were such that a reasonable employee would have found the challenged action materially adverse, meaning Defendants' actions would have dissuaded a reasonable worker from making or supporting a charge of discrimination.

57.     There is a causal connection between Ms. Pagoda's protected activity and the adverse actions Defendants took against her, the most significant of which was terminating her employment.

58.     These acts and omissions were willful and malicious, and they were taken with reckless disregard for Ms. Pagoda's rights.

WHEREFORE, Ms. Pagoda demands judgment against Defendants comprising: (a) appropriate back pay with prejudgment interest, in amounts to be determined at trial; (b) other affirmative relief necessary to eradicate the effects of Defendants' unlawful employment practices, including but not limited to front pay and reinstatement; (c) compensation for past and future pecuniary losses resulting from the unlawful employment practices, in amounts to be determined at trial; (d) compensation for past and future non-pecuniary losses resulting from the unlawful practices complained of above, including emotional pain, suffering, inconvenience, mental

16

anguish, loss of enjoyment of life, and other non-pecuniary losses, in the amount of $300,000; (f) punitive damages for Defendants' malicious and reckless conduct described above, in the amount of $300,000; (g) attorney's fees, costs and expenses; and (h) such other, further, and general relief as to the Court seems just and proper.

**COUNT IV**
**(Disparate Treatment based on Sex/Gender in**
**Violation of Title VII of The Civil Rights Act of 1964,**
**42 U.S.C. §2000e, *et seq*.)**

59.     Ms. Pagoda incorporates the allegations in the preceding paragraphs as if they were fully stated herein.

60.     Ms. Pagoda is a female and thus is a member of a protected class under Title VII.

61.     Acting at all relevant times as Defendants' authorized agents, Mr. Ruck and Mr. Roy supervised Ms. Pagoda, and they controlled the terms and conditions of Ms. Pagoda's employment, including permission of remote work, accommodations for disabilities, and termination.

62.     Defendants allowed male employees to work remotely for family reasons but discouraged Ms. Pagoda from asking to work remotely, whether for disability accommodation or day care issues.

63.     Defendants denied remote work on October 4, 5 and part of 6, to Ms. Pagoda after her hospitalization in October 2017 but allowed certain male employees to work remotely on a routine basis.

64.     Defendants accommodated at least one other male employee with disabilities but would not complete the interactive process with Ms. Pagoda to accommodate her disability.

65.     Defendants' termination of Ms. Pagoda was based on Ms. Pagoda's sex.

66.     Defendants' acts and omissions were willful and malicious, and they were taken with reckless disregard for Ms. Pagoda's rights.

WHEREFORE, Ms. Pagoda demands judgment against Defendants comprising:   (a) appropriate back pay with prejudgment interest, in amounts to be determined at trial; (b) other affirmative relief necessary to eradicate the effects of Defendants' unlawful employment practices, including but not limited to front pay and reinstatement; (c) compensation for past and future pecuniary losses resulting from the unlawful employment practices, in amounts to be determined at trial; (d) compensation for past and future non-pecuniary losses resulting from the unlawful practices complained of above, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, in the amount of $300,000; (f) punitive damages for Defendants' malicious and reckless conduct described above, in the amount of $300,000; (g) attorney's fees, costs and expenses; and (h) such other, further, and general relief as to the Court seems just and proper.

### COUNT V
### (Disparate Treatment based on Disability in Violation of the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-606, *et seq.*)

67.     Ms. Pagoda incorporates the allegations in the preceding paragraphs as if they were fully stated herein.

67.     From late February, 2017 through the termination of her employment in November, 2017, Ms. Pagoda had a disability within the meaning of the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-601(b). Notwithstanding her disability, Ms. Pagoda was a "qualified individual" within the meaning of the ADA, 42 U.S.C. §12111(8), and her disability

was unrelated in nature and extent so as to reasonably preclude the performance of her employment.  Md. Code Ann., State Gov't § 20-606(a)(1)(i).  In other words, she was able to perform the essential functions of her job.

68.     Ms. Pagoda requested the ability to work remotely on occasions when her disability prevented her from sitting at a desk for extended periods of time. Her doctors had instructed her to lie prone and apply heat packs as needed for brief intervals between work sessions to give her neck and back much needed relief.

69.     The accommodations Ms. Pagoda requested were reasonable. Defendants permitted two male employees in roles identical and similar to hers, respectively, to work remotely one day a week, every week. Ms. Pagoda did not take advantage of Defendants. Her requests for accommodation were infrequent, especially after Mr. Roy's instruction to her that she needs to use sick leave instead of working remotely.

70.     Defendants disliked being asked to accommodate Ms. Pagoda. They were irritated by her various attempts to discuss the issue.  President, Dennis Ruck was most irritated by Ms. Pagoda's formal request for reasonable accommodation which HR discussed with her on November 7, 2017.

71.     On November 8, 2017, Mr. Ruck, acting on behalf of Defendants, terminated Ms. Pagoda from her employment on the basis of her disability.

72.     By terminating Ms. Pagoda, Defendants discriminated against her on the basis of her disabilities, her record of such, or regarded her as being more disabled than she actually was. By so discriminating against Ms. Pagoda on the basis of her disabilities, Defendants violated the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-606(a)(1)(i).

73.     Before terminating Ms. Pagoda, Defendants discriminated against her on the basis of her disabilities through various adverse employment actions against Ms. Pagoda that affected her advancement, and other terms, conditions and privileges of employment.  These actions, ranging from excluding her from meetings to withholding information she needed to serve her clients and others, were such that a reasonable employee would have found the challenged action materially adverse, meaning Defendants' actions would have dissuaded a reasonable worker from making or supporting a charge of discrimination.  By so discriminating against Ms. Pagoda on the basis of her disabilities, Defendants violated the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-606(a)(1)(i).

74.     Defendants' acts and omissions were willful and malicious, and they were taken with reckless disregard for Ms. Pagoda's rights.  As a result of Defendants' violations of the Maryland Fair Employment Practices Act, Ms. Pagoda has suffered and is suffering injuries, including loss of past, present, and future earnings and considerable mental distress.

WHEREFORE, Ms. Pagoda demands judgment against Defendants comprising:  (a) appropriate back pay with prejudgment interest, in amounts to be determined at trial; (b) other affirmative relief necessary to eradicate the effects of Defendants' unlawful employment practices, including but not limited to front pay and reinstatement; (c) compensation for past and future pecuniary losses resulting from the unlawful employment practices, in amounts to be determined at trial; (d) compensation for past and future non-pecuniary losses resulting from the unlawful practices complained of above, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, in the amount of $300,000; (f) punitive damages for Defendants' malicious and reckless conduct described above, in the amount

of $300,000; (g) attorney's fees, costs and expenses; and (h) such other, further, and general relief as to the Court seems just and proper.

### COUNT VI
### (Violation of the Maryland Fair Employment Practices Act – Illegal Failure to Make Reasonable Accommodation, Md. Code Ann., State Gov't § 20-606, *et seq.*)

75.     Ms. Pagoda incorporates the allegations in the preceding paragraphs as if they were fully stated herein.

76.     From late February, 2017 through the termination of her employment in November, 2017, Ms. Pagoda had a disability within the meaning of the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-601(b).

77.     Notwithstanding her disability, Ms. Pagoda was a "qualified individual" within the meaning of the ADA, 42 U.S.C. §12111(8 and her disability was unrelated in nature and extent so as to reasonably preclude the performance of her employment.  Md. Code Ann., State Gov't § 20-606(a)(1)(i).   In other words, she was able to perform the essential functions of her job with reasonable accommodation.

78.     After her automobile accident in February, 2017, Ms. Pagoda requested the ability to work remotely on occasions when her disability prevented her from sitting at a desk for extended periods of time. Her doctors had instructed her to lie prone and apply heat packs as needed for brief intervals between work sessions to give her neck and back much needed relief.

79.     Ms. Pagoda's supervisor, Jonathan Roy, was reluctant to grant such requests. He strongly encouraged her to use sick leave when her neck needed a rest. He had communicated that Defendants have a policy of not permitting remote work when someone is the primary caregiver of a child, notwithstanding whether Ms. Pagoda's disability prompted her request and her son

would be in daycare and not home with her.  Ms. Pagoda attempted to meet with President, Dennis Ruck to address the remote work policy, to no avail.

80.     Finally, in October, 2017, Ms. Pagoda made a formal, written request for a reasonable accommodation of remote work on the occasions when her disability prevented her from sitting at a desk for extended periods without the ability to obtain relief. Human resources contacted her about her request on November 7, 2017 and advised that it was denied.

81.     Defendants offered to conduct an ergonomic workstation assessment which Ms. Pagoda was willing to consider.  However, the very next day, Defendants terminated Ms. Pagoda's employment.

82.     Ms. Pagoda's request for occasional use of remote work was a reasonable request. Her work was performed on the computer and could be done from anywhere. Two of her male colleagues worked from home once a week, every week. Had she been allowed to work remotely for her disability, instead of using sick leave, Ms. Pagoda would have worked only 6 more days in 2017 remotely.  Her requested accommodation would not have imposed an undue hardship on Defendants.

83.     By failing to accommodate Ms. Pagoda's disability, Defendants discriminated against her on the basis of her disabilities in violation of the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-606(a)(4).

WHEREFORE, Ms. Pagoda demands judgment against Defendants comprising: (a) appropriate back pay with prejudgment interest, in amounts to be determined at trial; (b) other affirmative relief necessary to eradicate the effects of Defendants' unlawful employment practices, including but not limited to front pay and reinstatement; (c) compensation for past and future

22

pecuniary losses resulting from the unlawful employment practices, in amounts to be determined at trial; (d) compensation for past and future non-pecuniary losses resulting from the unlawful practices complained of above, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, in the amount of $300,000; (f) punitive damages for Defendants' malicious and reckless conduct described above, in the amount of $300,000; (g) attorney's fees, costs and expenses; and (h) such other, further, and general relief as to the Court seems just and proper.

**COUNT VII**
**(Unlawful Retaliation in Violation of the Maryland Fair Employment Practices Act,**
**Md. Code Ann., State Gov't § 20-606(f)**

84.     Ms. Pagoda engaged in a protected activity: a) by requesting accommodation for her disability in the form of requests to work remotely, and b) by opposing Defendants' denials of remote work.

85.     Ms. Pagoda's requests for accommodation for her disability include her requests to her supervisor to work remotely:  i) after her accident in the Spring of 2017 when her neck/back pain was acting up, ii) her request to work remotely after her hospitalization in October 2017, and iii) as part of her formal, written reasonable accommodation request that she made in October 2017 and that she first discussed with HR on November 7, 2017.

86.     Ms. Pagoda's opposition to Defendants' denials of remote work include her attempt to engage in the interactive process in November 2017 to understand why remote work was denied and to explore other reasonable accommodations. Her opposition also included her various attempts following her February 2017 accident to discuss with her immediate supervisor, Jonathan Roy and to then President, Dennis Ruck, the remote work policy as applied to her, her desire to

encourage revision of the remote work policy, and her requests to reinstate sick leave time that she was forced to take instead of being allowed to work remotely following hospitalization.

87.     Acting at all relevant times as Defendants' agent, Mr. Ruck took adverse employment action against Ms. Pagoda by declaring Ms. Pagoda unhappy and terminating her employment on November 8, 2017.  He terminated Ms. Pagoda's employment, and in so doing, the continuation of the ADA's "interactive process," just one day after HR told Ms. Pagoda that it was not approving her reasonable accommodation request to work remotely on occasions when her disability acted up.

88.     A reasonable employee would find that being terminated is a materially adverse action which would dissuade an employee from requesting a reasonable accommodation for disability or otherwise making or supporting a charge or complaint of discrimination.

89.     Between the time of Ms. Pagoda's accident in February, 2017 and her termination in November, 2017, Defendants took various adverse employment actions against Ms. Pagoda that affected her advancement, and other terms, conditions and privileges of employment.  These actions, ranging from excluding her from meetings to withholding information she needed to serve her clients and others, were such that a reasonable employee would have found the challenged action materially adverse, meaning Defendants' actions would have dissuaded a reasonable worker from making or supporting a charge of discrimination.

90.     There is a causal connection between Ms. Pagoda's protected activity and the adverse actions Defendants took against her, the most significant of which was terminating her employment.

91.     These acts and omissions were willful and malicious, and they were taken with reckless disregard for Ms. Pagoda's rights.

WHEREFORE, Ms. Pagoda demands judgment against Defendants comprising: (a) appropriate back pay with prejudgment interest, in amounts to be determined at trial; (b) other affirmative relief necessary to eradicate the effects of Defendants' unlawful employment practices, including but not limited to front pay and reinstatement; (c) compensation for past and future pecuniary losses resulting from the unlawful employment practices, in amounts to be determined at trial; (d) compensation for past and future non-pecuniary losses resulting from the unlawful practices complained of above, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, in the amount of $300,000; (f) punitive damages for Defendants' malicious and reckless conduct described above, in the amount of $300,000; (g) attorney's fees, costs and expenses; and (h) such other, further, and general relief as to the Court seems just and proper.

## COUNT VIII
### (Disparate Treatment based on Sex/Gender in Violation of the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-606, *et seq.*)

92.     Ms. Pagoda incorporates the allegations in the preceding paragraphs as if they were fully stated herein.

93.     Ms. Pagoda is a female and thus is a member of a protected class under the Maryland Fair Employment Practices Act.

94.     Acting at all relevant times as Defendants' authorized agents, Mr. Ruck and Mr. Roy supervised Ms. Pagoda, and they controlled the terms and conditions of Ms. Pagoda's

employment, including permission of remote work, accommodations for disabilities, and termination.

95.     Defendants allowed male employees to work remotely for family reasons but discouraged Ms. Pagoda from asking to work remotely, whether for disability accommodation or day care issues.

96.     Defendants denied remote work to Ms. Pagoda after her hospitalization in October 2017 but allowed certain male employees to work remotely on a routine basis.

97.     Defendants accommodated at least one other male employee with disabilities but would not complete the interactive process with Ms. Pagoda to accommodate her disability.

98.     Defendants' termination of Ms. Pagoda was based on Ms. Pagoda's sex.

99.     Defendants' acts and omissions were willful and malicious, and they were taken with reckless disregard for Ms. Pagoda's rights.

WHEREFORE, Ms. Pagoda demands judgment against Defendants comprising:  (a) appropriate back pay with prejudgment interest, in amounts to be determined at trial; (b) other affirmative relief necessary to eradicate the effects of Defendants' unlawful employment practices, including but not limited to front pay and reinstatement; (c) compensation for past and future pecuniary losses resulting from the unlawful employment practices, in amounts to be determined at trial; (d) compensation for past and future non-pecuniary losses resulting from the unlawful practices complained of above, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, in the amount of $300,000; (f) punitive damages for Defendants' malicious and reckless conduct described above, in the amount

of $300,000; (g) attorney's fees, costs and expenses; and (h) such other, further, and general relief as to the Court seems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff, Olga Zingerman, f/k/a Olga Pagoda, by undersigned counsel and in accordance with Rule 38(b) of the Federal Rules of Civil Procedure, hereby demands a trial by jury as to all issues raised by her claims in this action that are triable as of right by a jury.

/s/ Janice B. Rockwell
Janice B. Rockwell, Esquire
Federal Bar No. 04814
Janice B. Rockwell, LLC
121-A North Court Street
Frederick, MD 21701
Phone:  (301) 631-0900
Fax:     (301) 631-0997
Email:  jan@rockwelllaw.com
Attorney for Plaintiff,
Olga Zingerman, f/k/a Olga Pagoda